The expression of an opinion ought to be the subject of particular exception, and triers to determine, but whether a person has made up any opinion may be ascertained in the way the counsel have asked.
Each person may be asked, whether he has made up any opinion that may influence his verdict.
This, too, is properly an exception for favor, and, strictly speaking, triers ought to determine it, but the Court in favor of life, humanity, and of a person whose understanding is lost by the visitation of God, will not call triers, unless insisted on.
After the jury were elected, tried, and sworn, and the indictment had been read by the clerk, he stated that, upon this bill of indictment, the prisoner at the bar had been arraigned and stood mute, whereupon a jury was sworn to inquire whether she stood mute through the visitation of God, and said jury found that she stood mute by the visitation of God; upon which the Court ordered the plea of not guilty to be entered on her behalf, and for the trial of which she be put upon her country, which country you are; so your charge is to inquire whether she is guilty *Page 84 
or not guilty. If she is guilty, you say so. If she is not guilty you say so, and no more; so hear your evidence.
The counsel for the prisoner moved to have the State's witnesses separated; ordered by the Court as a matter of course in capital cases.
Mr. Beaty was sworn in chief. He did not know the age of the prisoner, but supposed she was about thirteen years of age, or perhaps more. Was told by a person that the deceased was missing four nights and four days; believed he was dead; with another man he went to his house, and all over the plantation, supposing that he was dead somewhere about it, as he was subject to intoxication. Inquired of the children, of whom the oldest was the defendant. He proposed to stay with the children all night, as they might be afraid. The defendant answered that she had stayed before, and was not afraid. The house the old man lived in was built of logs, and raised a small distance from the ground; when standing on the outside of the house with several others, he by chance descried something under the house. Upon raising a puncheon of the floor on the inside, the deceased was found under the floor dead. He then made the following observation to the prisoner, Mary Doherty. "Now you knew this." She answered, "Beaty, you lie." He went for the coroner, and was upon the inquest. He saw blood upon an axe that was found upon the bed and wall of the house, near the head of the bed, and on a wheelbarrow.
The axe appeared to have been washed, but there was some in the eye of it. The deceased had blood on his shirt and about his head. The bed appeared to have been washed, but the blood was still to be seen. The house floor had been washed, but there was the stain of blood plainly to be seen on it, between the bed and where the deceased was found, which was five or six feet.
The prisoner said the last time she saw her father was four days before that, and about 150 yards from the house; this was before he was found.
Knowing that the deceased usually wore a greatcoat, he asked the prisoner where it was; she *Page 85 
answered, "You need not care." He told her that he wanted to see it; she then went to the bed where the deceased was supposed to have been murdered, and got it from thence, gave it to him, saying, "There, I suppose you are satisfied." The prisoner did not discover any concern when her father was found, nor when she was examined before the coroner, and looked and talked with a great deal of assurance.
The family of the deceased consisted of the prisoner, the little boy who had been offered as a witness in court, and two other younger children. He had lost his wife. Never saw the prisoner except once off the plantation, and never saw any of the family at a place of worship.
The deceased was found a few days before the 13th or 14th of April, when the coroner's inquest was held. He never saw the prisoner employed except once or twice, and then she was providing some victuals, nor did she ever go to school.
The house of the deceased was not much resorted to; they lived to themselves principally; did not know whether the prisoner was accustomed to converse with other children in the neighborhood or not. As to any difference in the understanding of the boy and the prisoner he had not observed. The other children were present when the body was found, and none of them appeared to be alarmed in the smallest degree. When found, the deceased looked as if he had been dead several days; the side of his head looked black, as if it had been bruised, but did not know whether his skull was broken or not. He had seen the deceased a few days before his death, going, by his house, home.
There was not any thing remarkable in the character of the deceased, nor did he know any thing of the conduct of the deceased to his family. He never saw him intoxicated at his own house; and always thought the prisoner possessed as much understanding as common. Of this he judged from her answers to questions he had asked her; but when he was there, which was frequently the case, she did not appear to be employed as girls of her age usually are. At the inquest, she did not say any thing *Page 86 
from which he could collect an idea that she was sensible of the atrocity of the crime committed.
John Miller was sworn. He was one of the inquest. Beside the several things stated by Mr. Beaty, he observed that when the deceased was taken from under the floor the right side of his head was cut, and on the other side his skull was broken, from which blood flowed; saw the blood on the chairs, on the floor, on his clothes, and against the wall at the head of the bed, where he supposed it to have sprinkled.
At the inquest, the prisoner was tied with some tow strings, and appeared to be hurt.
There was a parcel of old women pushing her about, and sometimes reviling her; he loosed her, took her to a branch, and told her to wash herself, as she was extremely dirty. He then talked to her familiarly, upon which she began to shed tears.
As she had been beaten and hauled about by several who were there, he pitied her, and told her she must not run away, to stay with him, and no person should injure her, nor should she be served in the manner she had been any more.
Having thus used persuasion with her, he told her she must tell him. The counsel for the prisoner objected, that no confession obtained from the prisoner by hope or fear should be given in evidence against her, and it was manifest that whatever she did tell this witness must have been extorted from her by an irresistible impulse, arising from the hope of better treatment.
The witness being asked if he did not believe this to be the case, he acknowledged he did.
For the defendant was cited 1 H. H. P. C. 24.
The attorney-general relied upon 1 Hay. 482, State v. Moore; and upon 1 M'N. 48, 49, The King v. Butcher, which, he contended, clearly authorized the giving in evidence so much of the defendant's confession as related to facts which appeared independent of that confession.